**UNITED STATES of America,**
**Appellant–Cross–Appellee,**

v.

**Ibrahim Ahmad SULEIMAN,**
**Defendant–Appellee–**
**Cross–Appellant.**

**Docket Nos. 98–1721, 99–1020.**

United States Court of Appeals,
Second Circuit.

Argued: Jan. 12, 2000

Decided: March 24, 2000

Richard Jasper, New York, N.Y. (James E. Neuman, New York. N.Y., on the brief), for defendant-appellee-cross-appellant.

Michael J. Garcia, Asst. U.S. Atty., New York, N.Y. (Mary Jo White, U.S. Atty., Christine H. Chung, Asst. U.S. Atty., New York, N.Y., on the brief), for appellant-cross-appellee.

Before: NEWMAN, WALKER, and SOTOMAYOR, Circuit Judges.

JON O. NEWMAN, Circuit Judge.

This appeal primarily concerns the issue of whether a defendant's perjury before a grand jury was "in respect to a criminal offense" for purposes of the sentencing enhancement required by section 2J1.3(c)(1) of the Sentencing Guidelines. The United States appeals from the November 25, 1998, judgment of the District Court for the Southern District of New York (Whitman Knapp, District Judge), which imposed a sentence of ten months (time served) on Ibrahim Ahmad Suleiman, after he was found guilty of perjury in violation of 18 U.S.C. § 1623 (1994). In determining the sentence, Judge Knapp declined to increase Suleiman's offense level by the enhancement that section 2J1.3(c)(1) would have required, if applicable. We conclude that the enhancement was required, but, because Suleiman has been deported and cannot now be present for resentencing, we dispose of the Government's appeal by affirming the judgment, without prejudice to an application by the Government to the District Court to resentence Suleiman in the event he becomes available for resentencing. The issues raised by Suleiman's cross-appeal, which challenge his conviction, have been disposed of in a summary order filed today.

## Background

On February 26, 1993, a bomb exploded at the World Trade Center in New York City, killing several people and injuring hundreds. Soon thereafter, a grand jury in the Southern District of New York began investigating the bombing. In September 1993, the grand jury issued indictments against Ahmad Mohammed Ajaj, Ramzi Ahmed Yousef, and others on various charges relating to their participation

in the plot to bomb the World Trade Center, including a charge of conspiracy to damage and destroy a building in violation of 18 U.S.C. § 844(i). Ajaj and various co-conspirators were convicted in March 1994. *See United States v. Salameh,* 152 F.3d 88, 108 (2d Cir.1998). Part of the conduct relevant to Ajaj's conviction included Ajaj's trip in April 1992 from his home in Houston, Texas, to attend a camp on the Afghanistan–Pakistan border where he learned how to construct homemade explosive devices. *See id.* at 107. During his time in Pakistan, Ajaj met Yousef and planned with him to bomb targets in the United States. *See id.*

On February 27, 1996, defendant-appellee Ibrahim Ahmad Suleiman was served with subpoenas in San Antonio, Texas, to appear before the grand jury in New York. An FBI agent explained to Suleiman that the grand jury sought to question him because "the information and the actual trial information from specifically Mohammed Ajaj and the World Trade Center bombing" indicated that Suleiman had traveled with Ajaj from Houston to Pakistan and "we wanted to find out what the circumstances were that he traveled with Mr. Ajaj."

On April 3, 1996, Suleiman testified before the grand jury. After Suleiman had stated his name, the Assistant United States Attorney ("AUSA") explained, "The grand jury is investigating violations of Title 18, United States Code, Section 371 and Section 844. Section 371 is a conspiracy statute and Section 844 relates to bombing of buildings used in interstate commerce." The AUSA added that the grand jury also had the power to indict for other federal crimes uncovered in the course of its investigation. Suleiman was informed of his constitutional privilege against self-incrimination and then questioned.

On October 28, 1996, the grand jury indicted Suleiman on three counts of perjury in violation of 18 U.S.C. § 1623. The indictment asserted that the grand jury's investigation focused in part on the origin of the relationship between Yousef and Ajaj. In particular, the indictment alleged that it was material that the grand jury ascertain, among other things, (1) why Ahmad Ajaj traveled from Houston, Texas, to Peshawar, Pakistan, in the spring of 1992; (2) the names of persons who accompanied Ajaj during his travels from Houston, Texas, to Peshawar, Pakistan, in the spring of 1992 and the reasons why they accompanied Ajaj; (3) the names of persons with whom Ajaj associated and traveled while in Pakistan and Afghanistan; (4) how Ajaj came to possess false documentation and manuals relating to bombs and other explosive devices; and (5) how Ajaj came to meet Yousef.

The indictment alleged three counts of perjury. Count One specified that Suleiman committed perjury when he testified that he intended to travel alone, made plans to travel alone, and actually did travel alone to Pakistan in April 1992, and that he did not know, or make any flight reservations with, a person named Muhammed Gihad Abid. Count Two alleged, among other things, that Suleiman committed perjury by testifying that he had never seen, nor seen Ajaj in possession of, various documents, including four large blue manuals containing information about making explosives. These manuals, which had been seized from Ajaj, bore Suleiman's fingerprints. Count Three alleged that Suleiman had committed perjury because, when presented with a photo of Yousef, he testified that he had never seen the person before. The trial jury found Suleiman guilty of all eleven specifications in the first perjury count, and twelve of the eighteen specifications in the second perjury count. The jury could not reach a verdict on Count Three.

At a sentencing hearing on November 1, 1998, the Government argued that Suleiman committed perjury "in respect to a criminal offense" under U.S.S.G. § 2J1.3(c)(1) (1998). Suleiman, however, argued that the perjury was not "in re-

spect to" the conspiracy to bomb the World Trade Center because he was never directly questioned about his involvement in that bombing. Sentencing was continued until November 24, at which time Judge Knapp, declining to make the section 2J1.3(c)(1) enhancement, sentenced Suleiman to ten months in prison (time served). Judgment was entered on November 25. After the sentencing, Judge Knapp issued an order explaining his decision not to add the enhancement. He characterized the case as one "where neither the questions asked nor the answers given referenced any criminal offense," and concluded, "[W]e adhere to our finding of fact that none of the defendant's concededly false statements were uttered 'in respect to a criminal offense.'" *United States v. Suleiman*, 29 F.Supp.2d 177, 177–78 (S.D.N.Y.1998). This explanatory order was entered on December 1.

Suleiman has served his prison term and has been deported.

### Discussion

### I. Mootness

 We consider *sua sponte* whether Suleiman's completion of his prison sentence or his subsequent deportation have rendered this appeal moot. *See Fox v. Board of Trustees*, 42 F.3d 135, 140 (2d Cir.1994) ("[T]he condition of mootness is not a defense that could be waived ..., but rather is a condition that deprives the court of subject matter jurisdiction."). "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). Therefore, "if an event occurs while a case is pending on appeal that makes it impossible for the court to grant 'any effectual relief whatever' to a prevailing party, the appeal must be dismissed." *Church of Scientology v. United States*, 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992) (quoting *Mills v. Green*, 159

U.S. 651, 653, 16 S.Ct. 132, 40 L.Ed. 293 (1895)).

 We first consider the significance of Suleiman's completion of his sentence. "A criminal case does not necessarily become moot when the convict finishes serving the sentence. Instead, the case will remain a live case or controversy if there exists 'some concrete and continuing injury' or 'collateral consequence' resulting from the conviction." *United States v. Mercurris*, 192 F.3d 290, 293 (2d Cir.1999); *see Spencer v. Kemna*, 523 U.S. 1, 7, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998). In *United States v. Soto–Holguin*, 163 F.3d 1217, 1219–20 (10th Cir.1999), *overruled in pertinent part by United States v. Meyers*, 200 F.3d 715, 721 & n. 3 (10th Cir.2000), the Tenth Circuit ruled that the Government's appeal of a sentence was not moot, even though the defendant had completed his sentence. In *Soto–Holguin*, the Government's appeal challenged the District Court's reduction of a 24–month sentence to ten months. In rejecting mootness based on completion of the sentence, the Tenth Circuit reasoned that, because the Sentencing Guidelines distinguish between sentences greater than and less than thirteen months to calculate a defendant's criminal history category, *see* U.S.S.G. § 4A1.1(a), (b), "the length of the disputed sentence may affect the duration of any future sentence" should the defendant be convicted of another crime. *Soto–Holguin*, 163 F.3d at 1220; *cf. Pennsylvania v. Mimms*, 434 U.S. 106, 108 n. 3, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977)(per curiam) (State's appeal of reversal of conviction not mooted by completion of sentence because "[i]n any future state criminal proceedings against [the defendant], this conviction may be relevant to setting bail and length of sentence, and to the availability of probation").

Our Court, however, has rejected the reasoning in *Soto–Holguin*, in light of the Supreme Court's decision in *Spencer*, 523 U.S. at 15, 118 S.Ct. 978. *See Mercurris*, 192 F.3d at 294. In *Spencer*, the Supreme

Court ruled that a plaintiff's habeas petition challenging revocation of parole was moot because the plaintiff had completed his sentence. The Court rejected the argument that mootness was avoided by the possibility that the parole revocation might be used to increase a future sentence, in the event of a future law violation. The person apprehending such a possibility, the Court explained, is " 'able—and indeed required by law—to prevent such a possibility from occurring.' " *Spencer*, 523 U.S. at 15, 118 S.Ct. 978 (quoting *Lane v. Williams*, 455 U.S. 624, 633 n. 13, 102 S.Ct. 1322, 71 L.Ed.2d 508 (1982)). Although one case in this Circuit held subsequent to *Spencer* that a challenge to the length of a completed sentence was not moot because "the length of a sentence may have an important collateral effect or consequence on future sentencing," *United States v. Rivera*, 164 F.3d 130, 132 (2d Cir.1999), this Court relied on *Spencer* to reject such reasoning in *Mercurris*, and held that "*Rivera* and the pre-*Spencer* cases relied on in *Rivera* are no longer controlling," *Mercurris*, 192 F.3d at 294 (citation omitted).[1] Indeed, the Tenth Circuit, also following *Spencer*, has expressly overruled *Soto–Holguin* on this point. *See Meyers*, 200 F.3d at 721 & n. 3.[2]

■ Although the prospect that an enhanced sentence might affect some *subse-quent* prosecution is too remote to avoid mootness, the issue remains whether mootness is avoided by the prospect of imposing an enhanced sentenced on Suleiman in the pending case. No question of mootness would arise if Suleiman were still in this country, available to be resentenced should the Government succeed on the merits of this appeal.[3]

The mootness issue is complicated, however, by the fact that Suleiman has not only served his sentence but also been deported. We recently ruled that a defendant's completion of his prison term and his subsequent deportation mooted *his* appeal of the sentence, *see Mercurris*, 192 F.3d, at 293–95, but that decision does not necessarily preclude the *Government's* appeal in this case. In *United States v. Villamonte–Marquez*, 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983), the Supreme Court, in reviewing, at the Government's request, a Court of Appeals decision to reverse the defendants' convictions, held that the case was not moot even though the defendants had been deported. "Following a reversal of the Court of Appeals, there would be a possibility that [the defendants] could be extradited and imprisoned for their crimes, or if [the defendants] manage to re-enter this country on

---

1. In *United States v. Londono*, 100 F.3d 236 (2d Cir.1996), this Court deemed the collateral consequences of the defendant's completed term of incarceration to be an alternative ground for ruling that the Government's appeal was not moot. *See* 100 F.3d at 242. In support of this proposition, the Court cited *United States v. Kassar*, 47 F.3d 562, 565 (2d Cir.1995), a pre-*Spencer* case also relied upon by the Court in *Rivera* that now, because of *Mercurris*, 192 F.3d at 294, is no longer controlling.

2. Although rejecting the view that the prospect of a future prosecution and sentencing would save from mootness the Government's appeal of a sentence already served, the Tenth Circuit in *Meyers* advanced a different rationale for entertaining such an appeal: the Government's "remediable injury" arising from "the trial court's failure to impose the appropriate sentence pursuant to statute or the sentencing guidelines." 200 F.3d at 721 n. 3. That rationale, unless limited to an appeal seeking additional prison time for a defendant available to be resentenced, seems overly broad, since in every case alleged to be moot, the party resisting mootness could contend that it had been "injured" by the trial court's error.

3. We express no view as to whether a Government appeal seeking to impose additional jail time on a defendant who has already completed his sentence implicates the Double Jeopardy Clause, because neither party has raised the issue. *Cf. United States v. Rico*, 902 F.2d 1065, 1068 (2d Cir.1990) ("So long as a sentence can be increased on appeal, defendant has no expectation of its finality. The expectation of finality comes from the prospect of release as defendant nears the end of his or her prison term.") (citation omitted).

their own they would be subject to arrest and imprisonment for these convictions." *Id.* at 581 n. 2, 103 S.Ct. 2573.

Although *Villamonte–Marquez* involved an appeal to reinstate convictions, not an appeal to increase a sentence already served, we have applied the reasoning of that decision to rule that where a defendant had completed his term of incarceration but continues to serve his term of supervised release, his deportation did not moot the Government's appeal of his sentence. *See United States v. Londono,* 100 F.3d 236, 242 (2d Cir.1996). "The government might make some effort to retrieve the defendant; alternatively, the defendant, who was in this country illegally, might return." *Id.; see United States v. Valdez–Gonzalez,* 957 F.2d 643, 646–47 (9th Cir.1992); *cf. United States v. Diaz–Diaz,* 135 F.3d 572, 578–79 (8th Cir.1998) (prospect that deported defendant would illegally re-enter the United States was "probable" and not "so speculative or remote" to moot the Government's appeal of defendant's sentence).

Similarly, if Suleiman voluntarily returns to the United States or is extradited, the Government could arrest him and require him to serve out the term of a longer sentence. Though arguably speculative, the possibilities of extradition or re-entry into the United States are precisely the kind of circumstances recognized in *Villamonte–Marquez* and *Londono* as preventing deportation from mooting a Government criminal appeal seeking an enhanced sentence. *See Valdez–Gonzalez,* 957 F.2d at 647 ("The Supreme Court [in *Villamonte–Marquez* ] thus seems willing to let speculative contingencies prevent the mootness of a government criminal appeal."). Suleiman's deportation, following the completion of his sentence, is not an event that "makes it impossible for the court to grant 'any effectual relief whatever' " to the Government. *Church of Scientology,* 506 U.S. at 12, 113 S.Ct. 447.

## II. The Merits

The issue on the merits is whether Suleiman committed perjury "in respect to" a criminal offense within the meaning of U.S.S.G. § 2J1.3(c)(1). Section 2J1.3 provides a base offense level of 12 for perjury. *See* U.S.S.G. § 2J1.3(a). That section also provides, "If the offense involved perjury ... in respect to a criminal offense, apply § 2X3.1 (Accessory After the Fact) in respect to that criminal offense, if the resulting offense level is greater than that determined above." *Id.* § 2J1.3(c)(1). In turn, section 2X3.1 sets the base offense level for an accessory after-the-fact at "6 levels lower than the offense level for the underlying offense," with a minimum of 4 and a maximum of 30, *id.* § 2X3.1(a), and instructs the sentencing judge to apply the base level offense for the underlying offense "plus any applicable specific offense characteristics that were known, or reasonably should have been known, by the defendant," *id.* § 2X3.1, comment. (n.1). In Suleiman's case, the enhanced offense level would have been 30,[4] and the resulting sentencing range would have been 97 to 121 months, limited by the ten-year aggregate statutory maximum for the two perjury counts.

Although the Sentencing Commission defined "underlying offense" in section 2X3.1 to mean "the offense as to which the defendant is *convicted* of being an accessory," *id.* (emphasis added), the defendant need not have been convicted for participating in the underlying offense for section 2J1.3(c)(1) to apply, *see United States v. Gay,* 44 F.3d 93, 95 (2d Cir.1994); *see also United States v. Renteria,* 138 F.3d 1328, 1335 (10th Cir.1998) (failure to charge defendant in underlying offense did not preclude application of section

---

4. It is undisputed that the underlying offense is conspiracy to damage or destroy a building in which six people were killed, and that this offense carries an offense level of 43. Section 2X3.1 specifies a level six levels below that level, or 37, but also specifies a maximum offense level of 30.

2J1.3(c)(1)). By treating a defendant convicted of perjury "in respect to" a criminal offense *as if* he were convicted as an accessory after-the-fact to that criminal offense, section 2J1.3(c)(1) increases a defendant's sentence for perjury by roughly the same degree as the degree of seriousness of the criminal offense "in respect to" which the defendant committed perjury (up to the statutory maximum). *See United States v. Conley*, 186 F.3d 7, 25 (1st Cir.1999) (noting that "the purpose of the cross-reference in … the perjury … guideline[ ] is to measure the gravity" of that offense).

■ For section 2J1.3(c)(1) to apply, however, a defendant's perjury must be "in respect to" a criminal offense, a requirement we have previously considered. In *Gay*, 44 F.3d at 94, the defendant testified before a federal grand jury "investigating armed robberies in Westchester County" and "was asked a series of questions about the robberies in which he was allegedly involved." *Id.* The defendant was subsequently indicted for conspiracy to commit armed robbery of a credit union in New Rochelle, N.Y., and for numerous counts of perjury. *See id.* The jury acquitted the defendant of robbing the credit union, but convicted him on twelve counts of perjury. *See id.* In affirming the District Court's finding that the defendant's perjury was "in respect to" the conspiracy to rob the credit union under section 2J1.3(c)(1), we noted that the crime "had unquestionably been committed, regardless whether [the defendant] was involved in it. Furthermore, some of [his] perjuries unquestionably related to that crime. For example, [the defendant] was convicted under Count Seven of falsely denying any knowledge concerning the Credit Union robbery." *Id.* at 95.

In this case, although the crime of conspiracy to bomb the World Trade Center has unquestionably been committed, the District Court characterized this case as one "where neither the questions asked nor the answers given referenced any

criminal offense," *Suleiman*, 29 F.Supp.2d at 177. Distinguishing *Gay* on the ground that the defendant in that case " 'was asked a series of questions about the robberies in which he was allegedly involved,' " *id.* (quoting *Gay*, 44 F.3d at 94), Judge Knapp made a "finding of fact" that none of Suleiman's "concededly false statements were uttered 'in respect to a criminal offense,' " *id.* at 178. In so finding, the District Court appears to have presumed that, as a matter of law, perjury can be "in respect to" a criminal offense only where the questions asked and the false statements given in response specifically refer to a criminal offense.

■ We review *de novo* a district court's interpretation of the Sentencing Guidelines, *see United States v. Shepardson*, 196 F.3d 306, 309 (2d Cir.1999), and we disagree with Judge Knapp's interpretation of "in respect to" as applied to perjury before a grand jury. The purpose of the "in respect to" enhancement is to treat more severely perjuries that risk an incomplete or an inaccurate investigation or trial of a criminal offense. *Cf.* U.S.S.G. § 2J1.3, comment. (backg'd) ("The Commission believes that perjury should be treated similarly to obstruction of justice. Therefore, … an alternative reference to the guideline for accessory after the fact is made."). Perjuries committed before grand juries investigating crimes will usually risk that consequence, and, as long as the witness has been alerted to the fact that the grand jury is investigating a criminal offense, false answers to material questions will almost always merit enhanced punishment.

■ Typically, "[t]he issues before a grand jury … are not predetermined. Its function is to investigate possible crimes against the sovereign so that it can make a judgment whether a trial on specific charges is necessary. The scope of legitimate inquiry is therefore broad…." *United States v. Mancuso*, 485 F.2d 275, 281 n. 17 (2d Cir.1973); *see In re Grand*

*Jury Subpoena Served Upon Doe,* 781 F.2d 238, 248–49 (2d Cir.1986); *United States v. Stone,* 429 F.2d 138, 140 (2d Cir.1970). The grand jury's investigation of a criminal conspiracy does not cease where, as here, the Government has already convicted some persons for participating in that conspiracy. The grand jury can still call witnesses to achieve a "complete" investigation where its inquiry "is directed at persons suspected of no misconduct but who may be able to provide links in a chain of evidence relating to criminal conduct of others." *United States v. Mandujano,* 425 U.S. 564, 573, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976) (plurality opinion). To perform its broad investigative function, the grand jury must be able to ask questions intended to probe witnesses for information about knowledge or conduct relevant to the criminal offense being investigated. Such questions need not always specifically refer to the underlying offense and would sometimes be ineffective if they did. A witness, punishable for any false answer, deserves enhanced punishment for a false answer that obstructs an inquiry concerning a criminal offense, and a witness, informed of the subject of such an inquiry, may not avoid the enhancement just because the question to which he gave a false answer did not alert him to the precise link between the question and the offense under inquiry.

The evidence indisputably establishes that Suleiman understood that the grand jury was investigating a criminal offense— the World Trade Center bombing. An FBI agent had explained to Suleiman that the grand jury sought to question him because "the information and the actual trial information from specifically Mohammed Ajaj and the World Trade Center bombing led us to determining that Mr. Suleiman had traveled with Mohammed Ajaj from Houston, Texas to Pakistan with a stop in New York and we wanted to find out what the circumstances were that he traveled with Mr. Ajaj." On the day of the testimony, the AUSA explained to Suleiman that the grand jury was investigating violations of statutes concerning conspiracy and the bombing of buildings used in interstate commerce. We conclude that Suleiman committed perjury "in respect to a criminal offense" under section 2J1.3(c)(1), and that the sentencing enhancement derived from the offense of conspiracy to bomb the World Trade Center should have been applied.

### III. The Remedy

■ Under normal circumstances, we would vacate the sentence originally imposed and remand for resentencing pursuant to Fed.R.Crim.P. 35(a)(1). Suleiman's deportation, however, makes it impossible for the District Court now to resentence in accordance with Rule 43(a) of the Federal Rules of Criminal Procedure, which requires the defendant to be present "at the imposition of·sentence, except as otherwise provided by this rule." Fed.R.Crim.P. 43(a). Although Rule 43 allows for sentencing under certain conditions where the defendant is "voluntarily absent at the imposition of sentence," Fed.R.Crim.P. 43(b)(2), that exception does not apply to Suleiman because a deportee by definition does not voluntarily leave the country.[5]

5. Nor is the need for the defendant's presence eliminated by Rule 43(c), which states that a defendant "need not be present … when the proceeding involves a reduction or correction of sentence under Rule 35(b) or (c) or 18 U.S.C. § 3582(c)." Fed.R.Crim.P. 43(c)(4). Rule 43(c) does not apply to Suleiman. *See* Fed.R.Crim.P. 43 advisory committee's note to 1998 amendments ("As amended, Rule 43(c)(4) would permit a court to reduce or correct a sentence under Rule 35(b) or (c), respectively, without the defendant being present. But a sentencing proceeding being conducted on remand by an appellate court under Rule 35(a) would continue to require the defendant's presence."). Neither Rule 35(b), which governs the reduction of a sentence for substantial assistance, *see* Fed.R.Crim.P. 35(b), nor Rule 35(c), which authorizes a court to correct a sentence "imposed as a result of arithmetical, technical, or other clear error" within seven days after the imposition of the sentence, Fed.R.Crim.P. 35(c), applies here. The provisions of 18 U.S.C.

Since resentencing now is not available, the normal remedy of vacating the sentence and remanding for resentencing has the potential for undesirable and even mischievous results. Such a remand would leave the case for perhaps an extended period of time in the jurisdictional limbo of the District Court's suspense calendar, and during that interval, the defendant would be able to assert that the sentence previously imposed has been vacated. To avoid these consequences, we will affirm the judgment of the District Court but do so without prejudice to an application by the Government to the District Court to vacate that judgment and resentence Suleiman in accordance with this opinion within 90 days after such time, if ever, as the Government knows or reasonably should know that Suleiman is in this country and available for resentencing in accordance with Fed.R.Crim.P. 43.

### Conclusion

The judgment is affirmed, without prejudice to a subsequent motion by the Government to increase the sentence pursuant to section 2J1.3(c)(1) of the Sentencing Guidelines.

§ 3582(c) also do not apply to the circumstances of this case.