**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 11-2037

UNITED STATES OF AMERICA

v.

AMIFA S. KNIGHT,
                    Appellant

On Appeal from the District Court of the Virgin Islands
(Division of St. Croix)
(D. C. No. 1-09-cr-00005-001)
District Judge: Honorable Raymond L. Finch

Argued on December 6, 2011

Before: FISHER, GREENAWAY,JR. and ROTH, <u>Circuit
Judges</u>

(Opinion filed: November 21, 2012)

Natalie Nelson Tang How, Esquire **(Argued)**
27 & 28 King Cross Street

Phoenix Court Business Complex
Christiansted, St. Croix, VI   00820

Counsel of Appellant


Alphonso G. Andrews, Jr., Esquire  **(Argued)**
Office of the Unites States Attorney
1108 King Street, Suite 201
Christiansted, St. Croix, VI   00820

Counsel for Appellee

------

O P I N I O N

------

**ROTH**, Circuit Judge:

Amifa Knight appeals the judgments of conviction and sentence on charges of perjury arising out of statements she made at a suppression hearing in the District Court of the Virgin Islands.  She seeks review of the District Court's ruling on an evidentiary issue, its denial of her motion for acquittal, and its application of the United States Sentencing Guidelines.  We find no error in the District Court's determinations on these issues, and we will therefore affirm.


I.  **BACKGROUND**

On May 12, 2008, Amon Thomas and Shadrock Frett engaged in a violent gun fight at Frett's apartment in St. Croix, United States Virgin Islands. Both men sustained gunshot wounds which resulted in their hospitalization at Juan Luis Hospital in St. Croix. Thomas, less severely injured than Frett, was discharged on May 16, 2008. Five days later, on May 21, 2008, at approximately 3:50 a.m., six masked gunmen entered the hospital, located Frett, and shot him to death.

A police investigation revealed that the gunmen entered the hospital through an employee entrance with the benefit of an employee "swipe card," proceeded directly to Frett's room, committed the murder, and left in under three minutes. Based on these circumstances, investigators suspected that a hospital employee may have been involved in the crime in some capacity. They examined the hospital's electronic patient records system, which showed that Knight, an admissions clerk, had accessed Frett's records at 7:24 p.m. on May 20, 2008, just hours before he was killed. Investigators subsequently obtained Knight's cell phone records, which indicated that she had telephone conversations with Thomas's brother, Halik Milligan, at 7 p.m. and 7:30 p.m. that same evening.

On January 26, 2009, Thomas Drummond, a special agent from the Federal Bureau of Investigation, and Dino Herbert, an officer of the Virgin Islands Police Department, jointly interviewed Knight about the hospital shooting. During her questioning, Knight stated to the investigators that she had no prior knowledge that someone would enter the hospital and kill Frett. She claimed that she did not know Frett's room number on May 20, 2008, and that she did not

3

remember accessing the hospital's records system to ascertain it that night. She admitted that Milligan was her boyfriend but denied that she had any phone conversations with him on May 20th. She further stated that she never disclosed Frett's room number to anyone.

The following day, January 27, 2009, Herbert and Drummond obtained a warrant and arrested Knight for making false statements to a federal agent on the basis of this interview. They again questioned her, but this time confronted her with her cell phone records, showing that she had been in contact with Milligan on the night of Frett's murder, and with a printout from the hospital's records system, indicating that she had looked up his room number that night. Faced with this evidence, Knight admitted that, prior to May 20, 2008, Milligan had asked her whether she could obtain Frett's room number and that she informed him that she could. She stated that at 7 p.m. on May 20th, Milligan called her and specifically asked her for Frett's room number. Knight admitted that she then accessed the hospital's records system to determine Frett's location, and that at 7:30 p.m., she called Milligan to inform him that she had this information. According to Knight, Milligan came to the hospital approximately one hour later, at which point she gave him Frett's room number. She admitted that she had been aware of a plan to kill Frett prior to the time that it was carried out.

On February 19, 2009, Knight was indicted on six counts of making false statements to a federal officer, in

4

violation of 18 U.S.C. § 1001(a)(2).[1]  She moved to suppress the statements she had made following her arrest on January 27th, arguing that they were coerced and that she had not been properly advised of her *Miranda* rights.  A hearing was held on Knight's suppression motion on April 16, 2009, at which she testified about her January 27th interrogation.  She also made a number of statements concerning events at the hospital on the night of Frett's murder.  First, she stated that she had accessed Frett's electronic hospital records three or four times on the evening of May 20, 2008.  Second, she claimed that she did so in order to determine his room number so that she could provide it to friends and family of Frett's who wanted to visit him and whose telephone calls had been transferred to her by the hospital's telephone operator.  Third, she claimed that Milligan was a friend of Frett's and wanted to visit him at the hospital.

On August 13, 2009, the Government issued a superseding indictment in Knight's case, charging that each of these three statements constituted perjury, in violation of 18 U.S.C. § 1621(1).  A charge of conspiring in Frett's

---

[1] Knight was specifically charged with falsely stating to Special Agent Drummond that (1) she did not know on May 20, 2008, that anyone was planning to enter the hospital to kill Frett; (2) on May 20, 2008, she did not know Frett's hospital room number; (3) she did not on May 20, 2008, make calls to or receive calls from two telephone numbers assigned to Milligan; (4) she did not speak with Milligan on May 20, 2008; (5) she did not recall whether she searched the hospital's records system on May 20, 2008, to ascertain Frett's room number; and (6) she had not disclosed Frett's room number to anyone.

murder, in violation of 14 V.I.C. §§ 551(1) and 922(a) (1), was also added. Knight was ultimately acquitted on the six original charges of making false statements to a federal agent and on the conspiracy charge. She was convicted, however, on the three perjury charges and sentenced to 36 months imprisonment.[2] Knight now appeals, arguing that the District Court erred in (1) admitting irrelevant and unfairly prejudicial evidence pertaining to the May 12th shooting at Frett's apartment and the May 21st shooting at the hospital, (2) denying her motion for acquittal as untimely, and (3) sentencing her pursuant to a provision of the United States Sentencing Guidelines that is applicable only to perjury that is in respect to a criminal offense.

## II. **DISCUSSION**

The District Court had jurisdiction under 48 U.S.C. § 1612, and we have jurisdiction under 28 U.S.C. § 1291. We will review the District Court's decision regarding the admissibility of evidence for abuse of discretion. *United States v. Serafini*, 233 F.3d 758, 768 n.14 (3d Cir. 2000). Our review of the dismissal of Knight's motion for acquittal as untimely, however, is plenary. *United States v. Mike*, 655 F.3d 167, 174 (3d Cir. 2001). Finally, with respect to the District Court's factual finding in applying the United States Sentencing Guidelines, our inquiry is whether it was clearly

---

[2] Knight was also charged with one additional count of perjury, which related to her testimony at the suppression hearing that she never expressed to anyone that she had prior knowledge of a plan to kill Frett at the hospital. She was found not guilty on this charge.

erroneous. *See United States v. Ali*, 508 F.3d 136, 143 (3d Cir. 2007).

### A. Admission of Evidence Related to the May 12th & May 21st Shootings

Prior to trial, Knight moved *in limine* to exclude evidence regarding both the gun battle between Frett and Thomas on May 12, 2008, and the subsequent killing of Frett on May 21, 2008, at the hospital. The motion was denied, and the jury heard evidence of both of these events. Knight contends on appeal that this evidence was irrelevant to the perjury charges and therefore should have been excluded under Rule 401 of the Federal Rules of Evidence. She further argues that even assuming its relevancy, the evidence was unfairly prejudicial and thus should have been excluded on the basis of Rule 403.

We conclude, however, that the evidence was not irrelevant to the perjury charges because it put into context why Knight was accessing Frett's hospital records and the nature of her relationship with Milligan and through him with Thomas. This inclusion of evidence of both shootings helped to explain why Knight committed perjury by lying about her access to the electronic hospital records and the reasons for that access.

Moreover, Knight's argument overlooks the fact that she was concurrently on trial for conspiracy to murder Frett. In order to establish her guilt on this charge, the government had to prove that she and at least one other person (1) intentionally entered into an agreement (2) with the purpose of killing Frett (3) with malice aforethought. *See* 14 V.I.C. §§

551(1), 922(a)(1); *see also United States v. Reyeros*, 537 F.3d 270, 277 to78 (3d Cir. 2008) (setting forth elements of conspiracy). The government sought to meet this burden by showing that Knight participated in a plot to kill Frett by obtaining his hospital room number and disclosing it to Milligan so that Frett's assailants could locate him and complete their mission. Any evidence that has a tendency to make this account more probable than it otherwise would be is relevant. *See* Fed. R. Evid. 401. Evidence related to the May 12th shooting at Frett's apartment is also relevant because it suggests a motive for the conspiracy to kill Frett and provides a link between that conspiracy and Knight.

Finally, we reject Knight's contention that evidence of these shootings should have been excluded on account of unfair prejudice. "Unfair prejudice means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403 (advisory committee's note). Relevant evidence may be excluded for this reason only if its "probative value is *substantially outweighed* by a danger of unfair prejudice." Fed. R. Evid. 403 (emphasis added). In determining whether evidence must be excluded as unfairly prejudicial, we owe "considerable deference" to the judgment of the District Court, *United States v. Guerrero*, 803 F.2d 783, 785 (3d Cir. 1986), and we will not disturb its ruling unless it was "arbitrary or irrational." *United States v. Universal Rehab. Servs. (PA), Inc.*, 205 F.3d 657, 665 (3d Cir. 2000) (en banc). As we have outlined, evidence of both shootings was relevant to all the charges against Knight in significant ways. Knight contends, however, that this relevance is trumped by the risk that the evidence might have led the jury to convict her in order to punish someone for the shootings rather than because

of a conclusion that she was guilty of perjury. We find no merit in this argument. With respect to the May 12th shooting at Frett's apartment, Knight makes no claim that the Government alleged or even implied that she had any involvement, and we therefore see no risk that the jury would have sought to punish her for that incident. Regarding the May 21st hospital shooting, evidence of that shooting is critical to explain the perjury. Moreover, to the extent that the jury was motivated to convict Knight in order to punish someone for that shooting, it could have found her guilty on the conspiracy charge. We see no logic in Knight's argument that the jury would acquit her on the conspiracy charge but punish her for the underlying events by convicting her of perjury.

We conclude that evidence pertaining to the May 12th and May 21st shootings was relevant and not unfairly prejudicial. Its admission at trial was therefore appropriate.

### *B. Denial of Knight's Motion for Acquittal*

Knight also claims that the District Court erred in denying her motion for acquittal, which she sought after the jury returned its verdict. The District Court denied that motion on the grounds that it was untimely. A motion for a judgment of acquittal sought after a jury verdict must be filed within 14 days after the verdict or after the court discharges the jury, whichever is later. Fed. R. Crim. P. 29(c)(1). This time limit may be extended for good cause before its expiration, or even afterwards if the defendant's failure to act was due to excusable neglect. Fed R. Crim. P. 45(b)(1). A district court has no jurisdiction, however, to consider a

9

motion for acquittal that is untimely. *United States v. Gaydos*, 108 F.3d 505, 512 (3d Cir. 1997).

The jury returned its verdict in Knight's case on December 22, 2009, meaning that her motion for acquittal initially needed to be filed by January 5, 2010. On December 29, 2009, she filed a motion for an extension of the time to file it. The District Court granted this request and gave her until 30 days after receipt of the trial transcript to make her filing. The transcript was available on March 16, 2010, rendering Knight's motion due by April 15, 2010. She did not submit it until July 9, 2010, 85 days beyond the due date. She also failed to make any showing of excusable neglect. Knight's motion was accordingly untimely, and the District Court was without jurisdiction to consider it. We conclude therefore that the denial of her motion was appropriate.

### C. Application of § 2J1.3(c) of the United States Sentencing Guidelines

Sentences for perjury convictions such as Knight's are governed by § 2J1.3 of the United States Sentencing Guidelines. In the ordinary case, that provision dictates a base offense level of 14 and a corresponding sentence range of 15 to 21 months imprisonment. U.S.S.G. § 2J1.3(a). Where perjury is "in respect to a criminal offense," however, it instructs that the defendant be sentenced pursuant to § 2X3.1 as if she were an "Accessory After the Fact" to that criminal offense. *Id.* at § 2J1.3(c). The District Court applied this cross-reference to Knight in light of its finding that her perjurious statements were in respect to the crime of first degree murder, and as a result determined that the Guidelines

10

range was 60 months.[3]  Knight contends that her perjury was not in respect to the offense of first degree murder and that her sentence must therefore be vacated.

Other courts have found that "[p]erjury is in respect to a criminal offense where the defendant knew or had reason to know, at the time of [her] perjury, that [her] testimony concerned such a criminal offense." *United States v. Leon-Reyes*, 177 F.3d 816, 824 (9th Cir. 1999) (citation and internal quotation marks omitted); *see also United States v. Flemmi*, 402 F.3d 79, 96 n.28 (1st Cir. 2005); *United States v. Blanton*, 281 F.3d 771, 776 (8th Cir. 2002); *United States v. Leifson*, 568 F.3d 1215, 1220 (10th Cir. 2009).  We agree with this interpretation of § 2J1.3(c) of the Sentencing Guidelines and adopt it here.  Applying this standard, we find that Knight's perjury was in respect to Frett's murder.  Her perjury convictions related to her testimony that (1) she accessed Frett's hospital records three or four times on the evening of May 20, 2008;[4] (2) she did so in order to be able to

---

[3] The Guidelines dictate that the base offense level for an accessory after the fact be "6 levels lower than the offense level for the underlying offense" but "not more than level 30."  U.S.S.G. § 2X3.1(a).  The base offense level for the underlying offense here, first degree murder, is 43, *id.* at § 2A1.1(a), and 6 levels less would be 37, so the maximum offense level of 30 and its corresponding sentence range of 97 to121 months would be triggered.  However, because the crime of perjury has a statutory maximum sentence of 60 months, 18 U.S.C. § 1621, that limit applies here.

[4] The Government's theory was that Knight falsely claimed to have accessed Frett's records three or four times,

provide his room number to friends and family who were making telephone calls to the hospital because they wanted to visit him; and (3) that Milligan was a friend of Frett's and called on May 20, 2008, because he wanted to visit Frett in the hospital. She gave this testimony at a suppression hearing in criminal proceedings concerning charges that she had made false statements to federal agents specifically investigating Frett's murder. All of the testimony, moreover, was given in response to questions which pertained to events at the hospital on the very night that Frett was killed and which were clearly being asked to establish facts surrounding that crime. Finally, based on her initial interview by investigators on January 26th, her post-arrest interrogation on January 27th, and the details of the charges of making false statements to a federal agent on which she had already been indicted, Knight was aware of the government's theory that Frett's murder had been facilitated by her obtaining his room location from the hospital's records system and disclosing it to Milligan. For these reasons, we conclude that Knight knew or had reason to know that the testimony underlying her perjury convictions concerned Frett's murder. Accordingly, the District Court did not commit clear error in finding that the perjury was in relation to that criminal offense.

---

rather than just once, in order to corroborate her claim that she had done so in response to multiple inquiries from his friends and family members and to mask the conspicuousness of her single instance of access in the short interval between two phone calls with Milligan.

12

## III. **CONCLUSION**

For the reasons stated above, we will affirm the District Court's judgments of conviction and sentence.